## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BARRY D. TURNER, II           )
                                )
      Plaintiff,               )
                                )
      vs.                     )     Case No._____
                                )
THEODORE J. LICKTEIG,        )
                                )
      Defendant.            )

## COMPLAINT

Plaintiff Barry D. Turner, II, by and through undersigned counsel, for his causes of action against Defendant Theodore J. Lickteig, states and alleges as follows:

## PARTIES

1.      Plaintiff Barry D. Turner, II is a citizen and resident of Nebraska.

2.      Defendant Theodore J. Lickteig is a citizen and resident of Kansas.

## JURISDICTION & VENUE

3.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the acts and omissions giving rise to Mr. Turner's claims occurred in Kansas and Mr. Lickteig is subject to personal jurisdiction in Kansas.

## FACTUAL ALLEGATIONS

5.      At all times relevant Mr. Lickteig was an attorney licensed to practice law in Kansas.

6.      At all times relevant Mr. Lickteig was in an attorney-client relationship with Mr. Turner.

7.      At all times relevant Mr. Lickteig was in a fiduciary relationship with Mr. Turner.

8.      Mr. Turner was diagnosed with dyslexia in kindergarten.

9.      Dyslexia is a condition that impairs an individual from interpreting and organizing graphic symbols, including letters of the alphabet.

10.     Dyslexia creates a learning disability that effects Mr. Turner's ability to read automatically which in turn interferes with his reading rate.

11.     Unfamiliar words Mr. Turner cannot sound out causes significant anxiety when test-taking, which is a side effect of those who suffer from dyslexia.

12.     Throughout his educational career, because of his dyslexia, Mr. Turner requested and received various accommodations for academic examinations including receiving extra time to complete a test, a private room to take a test, and proctors to read words in test questions when necessary.

13.     In January of 2007, Mr. Turner received a bachelor's degree in nursing from Bethel College in Newton, Kansas, earning a 3.5 grade point average (A average).

14.     The Department of Nursing at Bethel College determined Mr. Turner's dyslexia and test-taking anxiety did not prevent him from practicing nursing provided he received reasonable accommodations when testing as he had received throughout his educational career.

15.     After graduating from nursing school, Mr. Turner sought to obtain his national nursing license.  The only means by which a nursing school graduate can

2

obtain his/her national nursing license is by taking the NCLEX-RN Computerized Adaptive Test ("CAT").

16.     The National Council for State Boards of Nursing, Inc. ("NCSBN") works with state nursing boards on matters of common interest and concern that affect public health, safety and welfare

17.     The NCLEX-RN is the licensure examination distributed by the Kansas State Board of Nursing ("KSBN") to test candidates for national licensure.

18.     In 2007, Mr. Turner applied in Nebraska to take the NCLEX-RN.  Because of his dyslexia and test-taking anxiety, Mr. Turner requested accommodations from the Nebraska board of nursing but his requests were denied.  The board told him the NCSBN does not provide any accommodations for disabled persons to take the exam.

19.     Nevertheless, in 2007, because of his sound grasp of nursing material as demonstrated by his achievements in nursing school and his successful completion of a number of nursing examination preparation courses, Mr. Turner took the NCLEX-RN exam on three separate occasions in Nebraska without accommodations.

20.     Mr. Turner failed the NCLEX-RN examination all three times in 2007 because he did not receive reasonable accommodations to address his disability.

21.     In the process of evaluating the reasons for failing the NCLEX-RN in Nebraska, Mr. Turner learned that the CAT examination is a relatively new examination format that was implemented by the NCSBN in 2000 for candidates seeking national licensure.

22.    Since that time, academic researchers have documented significant flaws with the CAT format, including flaws that relate to those who suffer from dyslexia and/or test-taking anxiety.

23.    The CAT exam is administered in a booth at a testing center using a computer.  Even though there is a test proctor present, candidates are monitored by video and audio surveillance during the examination.

24.    For each exam, the NCSBN submits a bank of 3,000 questions to each testing computer.  The computer presents each succeeding question to the respective candidate based upon how the candidate responded to previous questions (adaptivity). Theoretically, few if any test-takers answer the same questions in their respective tests. The bank of questions varies the level of difficulty from easy, moderately difficult to very difficult.

25.    Mr. Turner particularly suffers from test anxiety when he is faced with an unfamiliar or constantly changing test format like the CAT examination which systematically changes the direction of the testing based on the candidate's previous answers.

26.    No nursing school and no review courses offer a practical learning experience to prepare for a test like the adaptive method of testing (CAT).

27.    Mr. Turner's disability prevents him from adapting to the constantly changing CAT format which places him at a significant disadvantage and creates an unfair playing field when compared to non-disabled test-takers.

28.    Mr. Turner's test anxiety is amplified by surveillance and is particularly severe in the initial phases of an examination.  This creates an unfair disadvantage for

Mr. Turner in the context of the NCLEX-RN examination because the test is designed to depend heavily on the candidate's initial answers, which in turn impacts the nature and direction of subsequent test questions.   Candidates that do poorly on the initial ten questions can fail the entire examination because of the test's dependence on the candidate's initial responses.

29.     The CAT format also prevents a candidate from returning to previous test questions to recheck his or her work.   Educators that worked with Mr. Turner used re-checking as a learning tool to accommodate his learning and testing disabilities.   The NCLEX-RN exam, however, prohibits this option.

30.     The CAT exam poses significant hurdles for Mr. Turner and all others who suffer from dyslexia.   The NCLEX-RN exam is designed to require the test-taker to answer between 75 and 265 questions.   The more uncertain the applicant is to have passed the exam after 75 questions, the more questions the test taker will need to answer.

31.     With test anxiety being higher at the beginning of the test, it is more likely that a dyslexic will provide a greater percentage of incorrect answers in the early stages of the exam.   Because of this, the dyslexic test-taker is not able to obtain a passing score because he/she is not given a sufficient number of questions later in the exam to recover from earlier incorrect answers.

32.     The KSBN controls the issuance of nursing licenses in Kansas, K.S.A. § 65-1115, *et seq.,* and requires each nursing license applicant to take and pass the NCLEX-RN exam.   (K.A.R. § 60-3-101(a)).

33.    In April of 2008, because of his disability, Mr. Turner contacted the KSBN and spoke with Gary Taylor about receiving accommodations to take the NCLEX-RN exam.  Mr. Turner explained his disability to Mr. Taylor and requested a private room to take the test, extra time to complete the test and a proctor to read certain words when necessary.    Mr. Taylor promised to provide Mr. Turner with his requested accommodations but imposed three conditions to take the examination with accommodations: (a) proof through school records that he suffered from dyslexia; (b) confirmation from Bethel College that he had received the requested accommodations; and (c) a letter stating his request for accommodations.  Mr. Taylor told Mr. Turner to formally apply for the NCLEX-RN in November of 2008 and to request his accommodations on the application form.  Mr. Taylor also told Mr. Turner he would contact him when he needed to provide the materials Mr. Taylor requested for receiving accommodations.

34.    Federal law requires all state boards of nursing to provide a location on its licensure application forms to explain requested accommodations.

35.    In November of 2008, as directed by Mr. Taylor, Mr. Turner applied to take the NCLEX-RN licensure exam but the application form did not contain any information about whether the applicant had a disability and, if so, what accommodations, if any, the applicant requested despite being told by Mr. Taylor in April of 2008 to provide this information on his application.

36.    During 2008, Mr. Turner took test preparation courses offered by Kaplan, NCSBN and Assessment Technologies Institute to prepare for the Kansas NCLEX-RN examination.

37.     In February of 2009, having not heard from Mr. Taylor about submitting the materials Mr. Taylor said he would need for his requested accommodations, Mr. Turner called Mr. Taylor.  During the call, Mr. Taylor told Mr. Turner he was not aware of any NCLEX-RN candidate requesting accommodations from the KSBN, and he knew of no candidate who was unable to negotiate the CAT adaptive format testing.  To support his opinion, Mr. Taylor told Mr. Turner that the NCLEX-RN application form does not even mention "disability status" as a consideration.  Mr. Taylor, however, did not deny Mr. Turner's previously requested accommodations but he told Mr. Turner that if he passed the examination, his nursing license would be restricted because he required accommodations during the NCLEX-RN test.  Yet, at no time did the Mr. Taylor offer any evidence or findings that Mr. Turner's learning disability and request for accommodations automatically proved Mr. Turner could not perform fully and successfully as a licensed registered nurse without restrictions.

38.     In March of 2009, Mr. Turner again contacted the KSBN to verify that his requested accommodations would be provided to him.  The KSBN told him that Mr. Taylor no longer worked for the KSBN.  The KSBN then told Mr. Turner that no accommodations could be provided because the NCLEX-RN examinations were always administered in a room where multiple test-takers were seated in booths with computers.  The KSBN said no private rooms were available for testing because no booths with computers were located in private rooms.  The KSBN offered no explanation about why it rejected Mr. Turner's requests for accommodations when Mr. Taylor never expressed concerns about the feasibility of Mr. Turner's accommodations.

The KSBN also told Mr. Turner that no alternative examination format existed for candidates with disabilities.

39.     The NCSBN and KSBN never requested any additional information from Mr. Turner to substantiate his disability and needs for accommodations, and at no time did Mr. Taylor tell Mr. Turner there would be any problem for Mr. Turner to receive his requested accommodations.

40.     Although distressed about the KSBN's refusal to provide him with his requested accommodations and knowing if any accommodations were granted, his ability to practice nursing would be limited and his nursing license restricted, Mr. Turner took the NCLEX-RN examination on May 29, 2009 and failed the exam for the fourth time because his computer prematurely shut down at question No. 57 even though each NCLEX-RN examination requires each test-taker to answer at least 75 questions regardless of their performance.

41.     As he had previously experienced in Nebraska, the KSBN examination room was filled with the distractions of other nursing candidates, a testing proctor and audio and video surveillance while he took the only test format offered, the CAT examination.

42.     When the KSBN reported Mr. Turner's test results it inaccurately noted that Mr. Turner answered 84 questions.  This statement could not be accurate because Mr. Turner's computer shut down after he answered question No. 57.

43.     Mr. Turner contacted the KSBN and the NCSBN after receiving his test results and both agencies told him there was no point in appealing his test result because no test result had ever been changed.

44.     In an effort to learn more about why he had difficulty with the NCLEX-RN examination format, Mr. Turner contacted Dr. David Weiss, Professor of Psychology and Psychometrics at the University of Minnesota, the creator of the CAT format.  Dr. Weiss told Mr. Turner he was mentoring a graduate student, Dr. Rich Guyer, who was publishing a research dissertation for his doctoral degree regarding a recently discovered, serious and significant flaw in the CAT format that adversely affected test-takers who suffered from test anxiety but were otherwise high-achievers.  Dr. Guyer noted that this certain subgroup was likely to fail the CAT format, and that if Mr. Turner suffered from test anxiety as a result of his dyslexia, he too would likely fall into that failing subgroup.

45.     Dr. Guyer's dissertation is titled, *"Effect of Early Misfit in Computerized Adaptive Testing on the Recovery of Theta."*  Other academic research has also identified and studied this problem with the CAT format.  <u>See</u> Rulison and Loken, *"I've fallen and I Can't Get Up: Can High-Ability Students Recover from Early Mistakes in CAT?*, <u>Applied Psychological Measurement</u>, Vol. 33, No. 2, March, 2009, pp. 83-101.

46.     Because academic research has revealed significant flaws with the CAT format, including flaws that relate to those who suffer from test-taking anxiety, the national boards of medicine continue to administer standardized testing in the static medium of pencil and paper.  Because of complaints to the NCSBN about the high number of NCLEX-RN test failures, the NCSBN held a private meeting in September of 2009 to discuss changing the pass/fail standard for the test.  No results from the meeting were ever made public and no changes were made to the NCLEX-RN examination format.

47.    In October of 2009, Mr. Turner underwent an updated neuropsychological evaluation with. Dr. Scott Napolitano, a licensed neuropsychologist specializing in young adult disorders.  Dr. Napolitano determined that Mr. Turner indeed suffered from test anxiety because of his dyslexia and he opined that Mr. Turner required an alternative testing format because his dyslexia and test anxiety prevented him from being able to negotiate the CAT format.

48.    As a result of Mr. Turner failing the NCLEX-RN licensure examinations, Mr. Turner has been unable to earn a living as a licensed registered nurse in Kansas or any other state.

49.    In 2010, Mr. Turner retained Mr. Lickteig to file a complaint with the KSBN and the NCSBN about the discriminatory practices and effects the NCLEX-RN examination had on Mr. Turner.  If the boards refused to provide Mr. Turner with reasonable accommodations to take the examination or provide an alternative test format, Mr. Lickteig agreed file a lawsuit on behalf of Mr. Turner against the boards for the discriminatory practices associated with NCLEX-RN examination.  Mr. Turner agreed to pay Mr. Lickteig his hourly rate for undertaking these tasks.

50.    On November 10, 2010, Mr. Lickteig sent the NCSBN and the KSBN a demand letter which discussed in detail the factual information contained in foregoing paragraphs of this Complaint.

51.    The KSBN responded to Mr. Lickteig's demand letter on November 15, 2010 claiming Mr. Turner never requested in writing any accommodations for the NCLEX-RN exam as the Board claimed was required by Kansas law.

52.     However, the KSBN incorrectly interpreted Kansas law because no Kansas law requires requests in writing for accommodations.  The law only requires written proof of a disability from the examining physician.  Mr. Lickteig had written proof from Mr. Turner's physician of Mr. Turner's disability but he failed to furnish the KSBN with this information.

53.     Furthermore, had the KSBN complied with state and federal law and included on its application form a section where Mr. Turner could request accommodations he would have done so in November of 2008 when he formally applied to take the NCLEX-RN examination in May of 2009.

54.     The KSBN's November 15, 2010 letter is also nonsensical because "reasonable accommodations" do not exist, have never existed and will never exist because all state nursing boards refuse to provide reasonable accommodations for the NCLEX-RN examination in violation of the Americans with Disabilities Act ("ADA") and the United States Constitution.

55.     On January 31, 2011, Mr. Lickteig filed a lawsuit on behalf of Mr. Turner against the NCSBN, the KSBN and several individuals employed by the KSBN in the United States District Court for the District of Kansas in a case styled Turner v. National Counsel of State Nursing Boards, Inc. et al., Case No. 11-CV-2059 KHV/JPO (hereinafter the "Lawsuit").

56.     Mr. Lickteig asserted seven ADA claims against the KSBN and its members and employees in their official and individual capacities (hereinafter collectively the "Kansas Defendants").  For each claim, Mr. Lickteig sought monetary damages of more than $75,000 and unspecified declaratory and injunctive relief.

57.     In Counts VI and VII, Mr. Lickteig asserted two ADA claims against the NCSBN for injunctive relief only.

58.     In Count I, Mr. Lickteig asserted that because the Kansas Defendants failed to provide a location on the nursing exam application for an applicant to describe disabilities and request accommodations, they discriminated against disabled individuals, including Mr. Turner, by excluding them from the benefits of the nursing license program in violation of 42 U.S.C. § 12132.

59.     In Count II, Mr. Lickteig asserted that because the Kansas Defendants denied reasonable accommodations for the nursing license examination, they discriminated against Mr. Turner as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

60.     In Count III – which is almost identical to Count II – Mr. Lickteig asserted that the Kansas Defendants failed to provide Mr. Turner reasonable accommodations during the nursing license examination and thereby discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

61.     In Count IV, Mr. Lickteig asserted that the threat of a license restriction by the Kansas Defendants (Gary Taylor) deterred him from pursuing his request for reasonable accommodations in taking the nursing license examination and thus deprived him of a level playing field in taking the exam and discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

62. In Count V, Mr. Lickteig asserted that the threat of a license restriction by the Kansas Defendants prospectively interfered with his practice of nursing and thus discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

63. In Count VI, Mr. Lickteig alleged that because all defendants failed to provide an appeal procedure for applicants and takers of the NCLEX-RN, they discriminated against disabled individuals, including Mr. Turner, by excluding them from the benefits of the license program in violation of 42 U.S.C. §§ 12132 and 12189.

64. In Count VII, Mr. Lickteig alleged that the failure of the all defendants to provide an alternative to the CAT format for test-takers of the NCLEX-RN had the effect of discriminating against disabled individuals, including Mr. Turner, by excluding them from the benefits of the license program in violation of 42 U.S.C. §§ 12132 and 12189.

65. On September 2, 2011, Mr. Lickteig filed an amended complaint which added two KSBN employees (Mary Blubaugh and Gary Taylor) as defendants.

66. On September 19, 2011, the NCSBN and the Kanas Defendants filed respective motions to dismiss Mr. Turner's amended complaint.

67. On April 24, 2012, the Honorable Kathryn H. Vratil issued a Memorandum and Order dismissing all of Mr. Turner's claims.  (April 24, 2012 Memorandum and Order attached hereto as Exhibit A and incorporated herein by reference).

68. Judge Vratil based her decision on various deficiencies in the amended complaint Mr. Lickteig filed on Mr. Turner's behalf, including, but not limited to, the following:

  A. The Kansas Defendants asserted that legislative immunity shielded them from Mr. Turner's claims for money damages and injunctive

13

relief because Mr. Lickteig did not allege sufficient facts or allege a violation of the Fourteenth Amendment to support Mr. Turner's claims.

B.     The Kansas Defendants also sought dismissal of Counts I through V for injunctive relief because Mr. Lickteig did not assert "any on going" ADA violations.  Judge Vratil noted Counts I through V essentially alleged the Kansas Defendants violated the ADA because they failed to provide reasonable accommodations for the May 29, 2009 exam and thereby denied him the benefits of the of the licensing program on the basis of Mr. Turner's disability.  The Kansas Defendants claimed because Mr. Lickteig did not allege any ongoing violations of the ADA, this prohibited Mr. Turner from obtaining an injunction.  Judge Vratil agreed noting "plaintiff has not alleged that any current [KSBN] policy – or any on-going conduct by any [KSBN] official or employee – violated the ADA. Moreover, because Mr. Lickteig did not request any prospective relief, such as an order that the Kansas Defendants allow him to re-take the examination with reasonable accommodations, the court found Counts I through V did not set forth viable claims for injunctive relief.

C.     As to Counts VI and VII, the KSBN and NCSBN claimed Mr. Turner's complaint did not describe any situation that could be remedied by injunctive relief directed to any state official.  Judge Vratil noted that Counts VI and VII referred in the past tense to conditions which existed in 2009, and did not identify any current conduct the court could enjoin a state official to do or stop doing.  Because Mr. Turner did not seek to re-take the test, the injunctive relief he requested would not benefit him and, therefore, Counts VI and VII failed to state viable claims for injunctive relief.

D.     With regard to the claims against the individual defendants in their individual capacities, the court found that these defendants in their individual capacities did not constitute a "public entity" and Mr. Turner's claims against them in their individual capacities must be dismissed.

E.     With respect to the Title III claims against the NCSBN and KSBN, the boards noted that Mr. Turner's complaint did not allege that Mr. Turner requested an accommodation from the NCSBN, or that the NCSBN failed to honor an accommodation.  As a result, the Judge Vratil held Mr. Turner lacked standing to assert claims against the NCSBN because he failed to allege a causal link between the NCSBN's alleged conduct and any harm to Mr. Turner.

69.     After Mr. Turner's Lawsuit was dismissed, Mr. Lickteig advised him to appeal Judge Vratil's Order to the Tenth Circuit Court of Appeals and he told Mr. Turner he had a very good chance of having Judge Vratil's decision overturned.

70.     On April 5, 2013, Mr. Lickteig timely filed a Notice of Appeal.

71.     On April 2, 2014, the Tenth Circuit Court of Appeals issued a decision upholding Judge Vratil's order of dismissal.   (April 2, 2014 Order and Judgement attached hereto as Exhibit B and incorporated herein by reference).

72.     Like Judge Vratil, the Tenth Circuit based its decision on various deficiencies in the amended complaint Mr. Lickteig drafted and filed on Mr. Turner's behalf including but not limited to the following:

A.     Mr. Lickteig did not allege that Mr. Turner's dyslexia or his resulting test-taking anxiety either caused or contributed to cause him to fail the exam.

B.     Although Mr. Turner's amended complaint did not identify any constitutional violation, the district court acknowledged Mr. Turner alluded to two possible Fourteenth Amendment claims in his trial court briefing – (1) a substantive due process claim based on denial of access to the courts; and (2) an equal protection claim based on the alleged lack of rational basis for the KSBN's threat to restrict his license if he took the exam with accommodation.  The Tenth Circuit noted Judge Vratil had concluded Mr. Turner had not adequately alleged either claim and it upheld Judge Vratil's decision finding Mr. Turner had failed to adequately allege an equal protection claim.

C.     With regard to the immunity issues raised by the individual defendants, the Tenth Circuit held that Mr. Turner failed to allege any ongoing conduct by the individual defendants violated the ADA; Mr. Turner's allegations related solely to past conduct; Mr. Turner did not ask for prospective relief; and Mr. Turner's amended complaint did not specify what declaratory or injunctive relief he sought. The Tenth Circuit therefore concluded "[b]ecause Turner's prayer for relief sought nothing more than unspecified 'declaratory and injunctive relief,'" it could not conclude the relief sought was truly prospective which prohibited an abrogation of the Ex Parte Young exception to governmental immunity.

15

D.     The Tenth Circuit also concluded that because Mr. Turner had not alleged facts that would rise to the level of proximate cause or a connection between the injuries he claimed and the rights he asserted, it upheld Judge Vratil's decision.

73.     After receiving the Tenth Circuit's decision upholding Judge Vratil's dismissal of Mr. Turner's lawsuit, Mr. Lickteig advised Mr. Turner to appeal the Tenth Circuit's decision to the United States Supreme Court and he told Mr. Turner he had a very good chance of having the Tenth Circuit's decision overturned.

74.     On October 14, 2014, the United States Supreme Court declined to hear Mr. Turner's appeal.

75.     At all times relevant Mr. Lickteig knew and was in possession of indisputable factual information to prove the KSBN and the NCSBN were systematically discriminating against Mr. Turner and all other similarly disabled persons on a prospective and on-going basis.  Mr. Lickteig, however, failed to include this factual information in Mr. Turner's complaint or in his amended complaint which caused or contributed to cause the Lawsuit to be dismissed.

76.     At all times relevant Mr. Lickteig knew or should have known how to draft Mr. Turner's complaint and amended complaint to assert claims that would have prevented the defendants in the Lawsuit from obtaining dismissal of the Lawsuit.

77.     At all times relevant Mr. Lickteig knew or should have known that to state a viable claim under Title II of the ADA, he was required to allege (a) Mr. Turner was a qualified individual with a disability; (b) Mr. Turner was excluded from participation in or denied the benefits of a public entity's services, programs or activities; and (c) such exclusion, denial of benefits or discrimination was because of Mr. Turner's disability.

16

Mr. Lickteig, however, failed make these allegations which caused or contributed to cause the Lawsuit to be dismissed.

78.     At all times relevant Mr. Lickteig knew or should have known that to state a viable claim under Title III of the ADA he was required to allege (a) Mr. Turner was a disabled person within the meaning of the ADA; (b) the defendants were subject to the ADA; and (c) the defendants discriminated against Mr. Turner within the meaning of the ADA.  Mr. Lickteig, however, failed to do so which caused or contributed to cause the Lawsuit to be dismissed.

79.     At all times relevant Mr. Lickteig knew or should have known how to plead and prove the individual defendants in the Lawsuit were not entitled to immunity under the Eleventh Amendment because Title II of the ADA abrogates Eleventh Amendment Immunity only where the alleged ADA violation also violated Mr. Turner's rights of under the Fourteenth Amendment.   Mr. Lickteig, however, failed to properly allege the individual defendants were not entitled to immunity and failed to allege any constitutional claims on Mr. Turner's behalf which caused or contributed to cause the Lawsuit to be dismissed.

80.     Mr. Lickteig also failed to allege facts in Mr. Turner's complaint and amended complaint sufficient to raise issues related to Mr. Turner being denied access to the courts which caused or contributed to cause the Lawsuit to be dismissed.

81.     But for Mr. Lickteig's negligence, gross negligence, legal malpractice and negligent misrepresentations as described in this Complaint, Mr. Turner would have prevailed on his claims in the Lawsuit.

## COUNT I – LEGAL MALPRACTICE

Plaintiff, for Count I of his causes of action against Defendant, states and alleges as follows:

82.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.     Defendant, in performing legal services for Plaintiff, had a duty to use that degree of learning, skill and care that a reasonably competent lawyer would use in similar circumstances.

84.     Defendant breached his legal duties to Plaintiff and was careless, negligent and grossly negligent in several material respects including but not limited to the following:

A.     Failing to abide by and follow the Federal Rules of Civil Procedure;

B.     Failing to know, understand and follow the law applicable to Plaintiff's claims;

C.     Failing to allege in the complaint and amended complaint existing facts that would have prevented dismissal of the Lawsuit;

D.     Failing to allege Mr. Turner had previously failed the NCLEX-RN examination on three occasions which created confusion in the Lawsuit and made it appear Plaintiff was misleading the court;

E.     Failing to allege the defendants in the Lawsuit were engaged in on-going and prospective discrimination;

F.     Failing to allege Plaintiff was seeking prospective relief;

G.     Failing to follow Plaintiff's instructions in the Lawsuit; and

H.     Failing to properly allege the matters discussed in Judge Vratil's Memorandum and Order and the Tenth Circuit's Order and Judgment.

85.     As a direct and proximate result of Defendant's legal malpractice, negligence and gross negligence, Plaintiff sustained damages including but not limited to incurring unnecessary legal fees and expenses and being unable to work as a licensed professional nurse.

86.     But for Defendant's legal malpractice and negligence, Plaintiff would have prevailed in the Lawsuit and he would have received accommodations to take the NCLEX-RN exam and/or would have been tested with a non-CAT testing format, and he would have been employed as a registered nurse.

WHEREFORE, Plaintiff prays for judgment on Count I of his claims against Defendant for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for punitive damages; for reimbursement and/or disgorgement of all legal fees and expenses paid to Defendant and all costs Plaintiff incurred at his direction; for past and future lost wages; for his costs and expenses in bringing this action and for such other relief as he may be entitled to by law or as the Court deems just and proper.

## **COUNT II – BREACH OF CONTRACT**

Plaintiff, for Count II of his causes of action against Defendant, states and alleges as follows:

87.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.     Defendant entered into a contract with Plaintiff and agreed to file a lawsuit on Plaintiff's behalf regarding the discriminatory practices involved in taking the NCLEX-RN exam and Plaintiff agreed to pay Defendant his hourly rate.

89.     The contract between Plaintiff and Defendant imposed upon Defendant a duty and obligation to know and understand the facts and the law applicable to Plaintiff's claims, rights, remedies and defenses in the Lawsuit.

90.     Defendant knew Plaintiff was relying upon him to represent his interests in the Lawsuit.

91.     Defendant materially breached his contract with Plaintiff by the acts and omissions described in this Complaint.

92.     As a direct and proximate result of Defendant's breach of contract, Plaintiff sustained damages including but not limited to incurring unnecessary legal fees and expenses and being unable to work as a licensed professional nurse.

93.     But for Defendant's breach of contract, Plaintiff would have prevailed in the Lawsuit and he would have received accommodations to take the NCLEX-RN and/or would have been tested with a non-CAT testing format, and he would have been employed as a registered nurse.

WHEREFORE, Plaintiff prays for judgment on Count II of his claims against Defendant for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for reimbursement and/or disgorgement of all legal fees and expenses paid to Defendant and all costs Plaintiff incurred at his direction; for past and future lost wages; for his costs and expenses in bringing this action and for such other relief as he may be entitled to by law or as the Court deems just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION

Plaintiff, for Count III of his causes of action against Defendant, states and alleges as follows:

94. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. Defendant, in the course of his business, profession and employment in which he had a pecuniary interest, negligently supplied false and/or incorrect information and/or negligently failed to supply material information to Plaintiff about the Lawsuit.

96. Plaintiff justifiably relied on Defendant's negligent misrepresentations and/or omissions of material facts.

97. Plaintiff was within the group of persons for whose benefit and guidance Defendant supplied information and Defendant intended the information that he supplied to Plaintiff to influence his decisions about his rights, remedies and defenses in the Lawsuit.

98. Defendant owed a duty to Plaintiff to use reasonable care in obtaining, evaluating and disclosing all material information about the Lawsuit to Plaintiff, and Defendant breached this duty by negligently supplying false and/or incorrect information and/or negligently failing to disclose material information to Plaintiff in several material respects including, but not limited to, as described in this Complaint and by (a) telling Plaintiff that it was unnecessary to include in his complaint and amended complaint the fact that Plaintiff had previously failed the NCLEX-RN exam on three prior occasions; (b) telling Plaintiff it was unnecessary to include other factual information in the

complaint and amended complaint which caused confusion in the Lawsuit leading the court to believe Mr. Turner was refusing to re-take the examination and only sought monetary relief; and (c) telling Plaintiff he would likely prevail in his appeals to the Tenth Circuit and the United States Supreme Court.

99.     If Plaintiff had been fully informed and apprised of all material information about his rights, remedies and defenses in the Lawsuit, Plaintiff would not have agreed to allow Defendant to represent him in the Lawsuit and instead would have retained competent counsel to represent his interests which would have resulted in Plaintiff prevailing in the Lawsuit.

100.   As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff sustained damages including but not limited to incurring unnecessary legal fees and expenses and being unable to work as a licensed professional nurse.

101.   But for Defendant's negligent misrepresentations, Plaintiff would have prevailed in the Lawsuit and he would have received accommodations to take the NCLEX-RN and/or would have been tested with a non-CAT testing format, and he would have been employed as a registered nurse.

WHEREFORE, Plaintiff prays for judgment on Count III of his claims against Defendant for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for reimbursement and/or disgorgement of all legal fees and expenses paid to Defendant and all costs Plaintiff incurred at his direction; for past and future lost wages; for his costs and expenses in bringing this action and for such other relief as he may be entitled to by law or as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury in the above-captioned case.

## DESIGNATION OF PLACE FOR TRIAL

Plaintiff hereby designated Kansas City, Kansas as the place for trial in the above-captioned case.


HAMILTON LAW FIRM LLC


By:/s/ Patrick A. Hamilton
Patrick A. Hamilton, KS Bar No. 16154
13420 Santa Fe Trail Drive
Lenexa, KS 66215
PHONE: (913) 888-7100
FAX: (913) 888-7388
patrick@lenexalaw.com
ATTORNEY FOR PLAINTIFF